IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RAFAEL MEDINA, | ) | CASE NO. 1:25-CV-583 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION AND** |
| SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

## I.  INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Rafael Medina's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Mr. Medina seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (Consent and Order, ECF No. 7.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying Mr. Medina's application for benefits.

## II.  PROCEDURAL HISTORY

In December 2022, Mr. Medina applied to the Social Security Administration (SSA) seeking DIB and SSI.[2] (Tr. 322, 329.) He claimed that he became disabled on December 9, 2022.

---

[1] Leland Dudek was serving as Acting Commissioner of Social Security when the complaint was filed. He served in that role until May 2025, when Frank Bisignano, the current Commissioner, was confirmed.

[2] The administrative transcript appears at ECF No. 8. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 128"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 1112").

(*Id.*) He identified three allegedly disabling conditions: (1) "back surgery"; (2) "neck surgery"; and (3) "liver." (Tr. 406.)

The SSA denied Mr. Medina's application initially and upon reconsideration. (Tr. 203–04, 213, 222, 223–24, 232, 240.) Mr. Medina requested a hearing before an administrative law judge (ALJ). (Tr. 262.) The ALJ held a hearing on April 8, 2024, at which Mr. Medina was represented by counsel. (Tr. 167–202.) Mr. Medina testified, as did an independent vocational expert. (*Id.*)

On May 3, 2024, the ALJ issued a written decision finding that Mr. Medina is not disabled. (Tr. 102–28.)

Mr. Medina requested review of the ALJ's decision. (Tr. 320–21.) His counsel argued that the ALJ erred at Step Three and Step Five of the sequential analysis (discussed further below), explaining that Mr. Medina's need for additional surgery and the failing of his spinal hardware "affects the listings, causes severe pain and precludes work." (Tr. 320.)

On January 28, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On March 25, 2025, Mr. Medina filed his Complaint, challenging the Commissioner's final decision that he is not disabled. (ECF No. 1.) Mr. Medina asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ erred by failing to consider how additional necessary surgical operations would affect the claimant's capacity to sustain ongoing substantial gainful activity.
>
> **Second Assignment of Error:** The ALJ erred when he discounted the evidentiary weight assigned to the medical opinions of the claimant's treating physician without identifying sufficient explanation of his rationale.

(Pl.'s Merit Br. at 12, 14, ECF No. 9, PageID# 1112, 1114.)

III.   **BACKGROUND**

A.   **Personal, Educational, and Vocational Experience**

Mr. Medina was born in June 1980 and was 42 years old on the date of his application. (*E.g.*, Tr. 205, 322.) He earned a GED. (Tr. 179.) Three years prior to his hearing, Mr. Medina worked full-time as a licensed barber in Florida. (Tr. 180.) He also has some previous miscellaneous work experience, including cleaning, cooking, operating a forklift, landscaping, and as a machine operator. (*E.g.*, Tr. 407.) Mr. Medina lives with his sister. (Tr. 177.) Mr. Medina has held a driver's license, but it is inactive and must be renewed before he would be able to drive. (Tr. 178.)

B.   **Function Reports**

Mr. Medina completed a function report; the form is not dated. (Tr. 415–17.) Mr. Medina wrote that he would be undergoing a second surgery on his spine, which would require him to recover in bed, and this recovery would prevent him from working. (Tr. 415.)

Mr. Medina described that it takes him a half hour to get out of bed because his back muscles and "back bracket" "lock[] up" (Tr. 416.) His left side is also numb when he gets up in the morning. (*Id.*) After he wakes up, he makes himself breakfast, takes his medications, and then takes a hot shower to soothe his back. (*Id.*) He then goes about his day, seeing to his appointments and errands, before eating dinner with his family in the afternoon and stretching for a half hour to keep his body from "lock[ing]." (*Id.*)

Mr. Medina is able to bathe himself, feed himself, and use the restroom alone. (*Id.*) His family often helps him prepare food. (Tr. 417.) He is able to dress himself, but "it burns [and] stings" when he puts on his shirt. (Tr. 416.) His family helps him maintain his hair and trim his facial hair. (*Id.*)

3

Mr. Medina is able to clean up after himself and do laundry, but his family helps him with lifting and ironing when he is not able to do so. (Tr. 417.)

Mr. Medina is "restless" at night, often getting up more than twice throughout the night. (*Id.*)

Mr. Medina described that depression sometime "take[s] a toll" on his body, but his family pushes him to not give up. (Tr. 417.)

C.   **Relevant Hearing Testimony**

1.   *Mr. Medina's Testimony*

At the outset of the hearing, Mr. Medina and his counsel informed the ALJ that, on the morning of the hearing, Mr. Medina had been scheduled for surgery with Dr. Belden. (Tr. 172–73.) Mr. Medina understood that he would be "out of commission" for six to eight months after the surgery. (Tr. 193.) The ALJ indicated that the record would be held open for the submission of additional records regarding the surgery. (Tr. 174.)

Mr. Medina testified that his weight fluctuates within a range of about fifty pounds, which he attributed to depression. (Tr. 178.)

Mr. Medina worked full-time as a machine operator at a tool and die shop in 2023, for about a month. (Tr. 179–80.) He left that position because it was physically difficult for him to lift certain objects required by that position. (*Id.*) Similarly, he worked at an employment center for around a month before leaving due to pain. (Tr. 180.)

Mr. Medina experiences pain throughout his entire spine and in his right shoulder. (Tr. 182.) He rated the pain as a nine on a scale of one to ten, even while taking medication. (Tr. 183.) If he is not on medication, the pain becomes a "fifteen." (*Id.*) He is not able to sit comfortably for longer than 30 minutes, and he cannot stand longer than 20 minutes without needing to sit down. (*Id.*) When he sits, he gets a sharp, aching pain through his spine. (Tr. 185.) He finds it difficult to walk

4

even to the front yard of the home where he is staying. (Tr. 184.) He cannot lift any weight at all, not even a coffee cup. (*Id.*)

Mr. Medina finds that he has difficulty gripping objects. (Tr. 181–82.) He cannot hold a pair of hair clippers because his "body jerks." (*Id.*; *see also* Tr. 187.) He drops things. (Tr. 182.) His sister helps him dress. (Tr. 186.) He experiences pain moving his head up and down, or side-to-side. (Tr. 192–93.)

Some days, Mr. Medina forgets to see to tasks like brushing his teeth, bathing, and taking medications. (Tr. 184–85.) He is unable to perform any household chores. (Tr. 186.)

Mr. Medina spends his days watching television and helping his nephew with homework. (Tr. 185.) He has difficulty watching television because he often has to stretch his back due to "back spasms." (*Id.*) He also experiences "cloudiness," describing that he often had "a lot" on his mind. (*Id.*)

In the six months before the hearing, Mr. Medina's condition has gotten worse. (Tr. 187.) His arm jerks and he cannot bend down even to tie his shoelaces. (*Id.*) Pain makes it difficult for him to fall asleep and stay asleep; he estimated that he sleeps four hours per night. (Tr. 188.) He can lift his right arm up to about his ears, but he cannot hold it in that position. (Tr. 189.) When he lifts his arm, he feels a "pulling" pain in the middle of his back. (*Id.*) He is able to reach out in front of himself, but not repetitively for a long time. (Tr. 189–90.)

Mr. Medina experiences anxiety, depression, and panic. (Tr. 190.) His back pain triggers these symptoms. (*Id.*) He has a history of substance abuse, but he has been sober since October 2023. (*Id.*) He takes suboxone and a muscle relaxing medication for his back pain. (Tr. 191.) He attends counseling three times per week. (*Id.*)

Mr. Medina does not leave the house out of fear that he will experience too much pain. (Tr. 192.)

### 2. *Vocational Expert's Testimony*

John Pullman testified as a vocational expert (VE) at the hearing. (Tr. 194.)

The VE classified Mr. Medina's past work as that of a barber (DOT 330.371-010). (Tr. 195.)

The ALJ asked the VE to assume that a hypothetical individual with Mr. Medina's age and education is capable of light-exertion work with certain exertional and non-exertional limitations. (Tr. 195.) The hypothetical person could occasionally reach overhead bilaterally; could frequently climb ramps and stairs but could never climb ladders, ropes, or scaffolds; could frequently balance and occasionally stoop, kneel, crouch, or crawl; and could never operate a motor vehicle or be exposed to unprotected heights or moving mechanical parts. (*Id.*)

The VE testified that such a person would be able to perform Mr. Medina's past relevant work as a barber, and could further perform the work of a mail clerk, housekeeping cleaner, or cafeteria attendant. (Tr. 195–96.)

The ALJ next asked the VE to assume that the hypothetical person was limited to light work, except that he could occasionally reach overhead bilaterally, frequently reach in all other directions bilaterally, frequently handle and finger bilaterally, occasionally climb ramps and stairs (but never ladders, ropes, or scaffolds), and occasionally balance, stoop, kneel, crouch, or crawl. (Tr. 196.) As with the first hypothetical, the ALJ asked the VE to assume that the hypothetical person could not operate a motor vehicle and could never be exposed to unprotected heights or moving mechanical parts. (*Id.*) The ALJ further asked the VE to assume that the individual could understand, remember, and carry out simple instructions; could use his judgment to make simple work-related decisions; would be able to deal with occasional changes in a routine work setting;

could frequently interact with supervisors, co-workers, and the public; but could not perform work requiring a specific production rate. (Tr. 196–97.)

The VE testified that such a person could not perform Mr. Medina's past relevant work as a barber, but they could still perform the work of a mail clerk, housekeeping cleaner, or cafeteria attendant. (Tr. 197.)

The ALJ next asked the VE to assume that the person from the second hypothetical would only be able to occasionally interact with supervisors, co-workers, and the public. (Tr. 197.) The person would be further limited in that they could never reach overhead with the right or left upper extremities. (*Id.*)

The VE testified that such a person could not perform the work of a housekeeping cleaner but could still perform the work of a mail clerk or cafeteria attendant, and further could perform the work of a marker. (*Id.*)

The ALJ next asked the VE to assume that the hypothetical person was limited to work at the sedentary level. (Tr. 198.) The VE testified that such a person could perform the work of a circuit board assembler, final assembler, or inspector. (*Id.*)

The VE then confirmed that the hypothetical person could not maintain competitive employment if they would be off task for 20 percent of an eight-hour workday or would be absent more than two days per month. (*Id.*) The VE testified that employers will not tolerate an employee who is off-task 15 percent or more of the workday or who was absent more than once a month. (Tr. 199.)

Mr. Medina's counsel asked the VE to assume that the hypothetical person from the ALJ's questions was further limited to occasional reaching, handling, and fingering bilaterally. (Tr. 199.) The VE testified that such a person would not be able to perform the work of a mail clerk, cafeteria

attendant, housekeeping cleaner, or marker. (*Id.*) But the person, assuming that they could frequently interact with others, could perform the work of a counter clerk or usher. (Tr. 200.) If the person were also limited to occasional interaction with others, they would not be able to sustain competitive employment. (*Id.*) Similarly, if the person were further limited to sedentary work, there would be no competitive employment available. (*Id.*)

    **D.**    <u>**State Agency Consultants**</u>

A disability examiner (Matthew Bass), a physician (Murari Bijpuria, M.D.) and a psychologist (Courtney Zeune, Psy.D.) reviewed Mr. Medina's claim at the initial review level. (Tr. 203–22.)

Dr. Zeune opined that Mr. Medina had demonstrated "minimal" non-exertional limitations. (Tr. 209.) She concluded that his mental-health conditions were not severe and appeared "mild." (*Id.*)

Dr. Bijpuria opined that Mr. Medina's reported symptoms—including being "physically unable to do anything"—"seem to be exaggerated." (*Id.*) Dr. Bijpuria identified that Mr. Medina's spinal issues were documented but did not reflect focal neurological deficits. (*Id.*) The doctor pointed out that the records showed point tenderness in the paraspinal muscles but also reflected intact sensation, no weakness, normal coordination and gait, and equal strength and range of motion in all extremities. (*Id.*)

Dr. Bijpuria limited Mr. Medina to occasionally lifting of objects weighing up to 20 pounds and frequent lifting of objects weighing up to 10 pounds. (Tr. 210.) Mr. Medina's ability to push and pull were otherwise unlimited, and Dr. Bijpuria noted that Mr. Medina could stand for six hours and sit for six hours in a normal workday. (*Id.*)

The doctor did not endorse manipulative limitations, but limited Mr. Medina to frequently climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequently balancing; and occasionally stooping, kneeling, crouching, and crawling. (Tr. 210–11.)

Based in part on these opinions, the consultants found that Mr. Medina was not disabled. (Tr. 213.)

In a letter explaining this decision to Mr. Medina, the SSA wrote that Mr. Medina had a history of spinal issues but had "no focal neurological deficits," intact sensation, and no significant weakness. (Tr. 246.) It noted that he was able to walk and move all his extremities without difficulty, and concluded that he is expected to remain capable of sedentary and light physical work demands. (*Id.*)

A disability examiner (Javonne Reed), a physician (Indira Jasti, M.D.), and a psychologist (Kevin Lauer, Ph.D.) reviewed Mr. Medina's claim at the reconsideration level. (Tr. 223–40.)

Dr. Lauer affirmed the opinion that Mr. Medina's mental-health conditions "would not be expected to cause more than mild limitations" and are therefore non-severe. (Tr. 235.)

Dr. Jasti largely affirmed the initial-level findings, although she further limited Mr. Medina to occasional overhead reaching due to his history of neck surgery. (Tr. 237–38.) She agreed that his ability to reach laterally or in front of him, and his ability to handle, finger, and feel, was not limited in any way. (Tr. 237.) Dr. Jasti also added an environmental limitation, namely that Mr. Medina should avoid all exposure to hazards such as unprotected heights and heavy machinery. (Tr. 238.)

Based on these opinions, the consultants determined that Mr. Medina was not disabled. (Tr. 240.)

In a letter explaining this decision to Mr. Medina, the agency wrote that he was limited in his ability to lift and carry heavy objects but would be able to lift and carry light objects that do not exceed 20 pounds occasionally and 10 pounds frequently. (Tr. 257.)

### E.  Relevant Medical Evidence

Mr. Medina underwent neck and back surgery in 2018, resulting in anterior cervical discectomy and fusion from the C5 to T1 vertebra, as well as the insertion of hardware in the spine. (*E.g.*, Tr. 512.)

On December 4, 2022, Mr. Medina went to a hospital emergency room complaining of back and chest pain and numbness and tingling in his shoulder. (Tr. 465.) He described that he had screws and plates in his back from surgeries "due to infection" (*Id.*) An x-ray of Mr. Medina's spine was notable for junctional spondylosis at the C3–C4 level "with posterior projecting disc ligamentum flavum buckling resulting in mild cord deformity." (Tr. 512). There was also "lucency surrounding the C4 articular mass screws in keeping with loosening." (*Id.*) Mr. Medina's physical examination at the hospital was largely normal, including that Mr. Medina displayed normal range of motion in general (specifically including the cervical back) and had no difficulty moving all his extremities. (Tr. 466.) He did report tenderness in the bilateral paraspinal muscles. (*Id.*)

On December 27, 2022, Mary Mooney—a registered nurse—noted that Mr. Medina reported that he could only stand for up to "5 minutes, sitting is less than 5 minutes, and walking is 20 minutes." (Tr. 515.) He reported his current pain as maxing out the pain scale (10/10) but said it fluctuates between a six and a ten. (*Id.*) He said the pain made it difficult to sleep. (*Id.*)

On January 31, 2023, Mr. Medina underwent an MRI, which revealed mild canal narrowing at the C3 and C4 levels; there was "no evidence of osteomyelitis or diskitis." (Tr. 671.)

Mr. Medina consulted with Jonathan Belding, M.D., on March 1, 2023 (Tr. 683). On examination, Mr. Medina had full strength bilaterally in his extremities, a normal gait, and no

myelopathic reflexes or sensory deficits. (Tr. 684.) Dr. Belding wrote that he "disagree[d] completely" with a construct surgery to the T3 level without fusion. (*Id.*) He noted that there was loosening of the screws at the C4 level. (*Id.*) Under the circumstances, surgical intervention would require revision surgery, which he remarked would be a "large deal" given Mr. Medina's age. (*Id.*) Dr. Belding recommended that Mr. Medina try injection intervention before considering surgery, remarking that it was "ridiculous" that insurance had not covered an injection instead of surgery. (*Id.*)

On May 24, 2023, Mr. Medina called a nurse line and explained that his insurance had approved the injection Dr. Belding recommended, but his appointment was not until June 2023. (Tr. 673.) He said that he had experienced worsening pain in the bilateral arms. (*Id.*) He also reported that he had been "working out and lifting weights every night" while staying at a recovery center. (*Id.*) The nurse recommended that he get himself to an emergency room for evaluation. (*Id.*)

Later that day, Mr. Medina went to a hospital emergency room complaining of numbness and tingling in his hands. (Tr. 669.) On examination, Mr. Medina had normal range of motion in his extremities and cervical back, displayed no spinous tenderness, had strong pulses, and displayed good grip strength bilaterally. (Tr. 671.) A CT scan showed no acute injury or change, but there was lucency around several spinal screws. (*Id.*; *see also* Tr. 708–09.) The hospital physician's assistant opined that he suspected Mr. Medina's numbness was "likely related" to Mr. Medina's recent use of crutches to address some knee pain. (Tr. 672.)

Mr. Medina consulted with Dain Finke, M.D., in a telephone appointment on June 22, 2023 (Tr. 665.) Mr. Medina reported that he had been playing basketball two months prior when he fell

and hurt his knee; he has been using crutches since the fall. (Tr. 666.) Dr. Finke referred him to an orthopedic doctor. (*Id.*)

Mr. Medina consulted with Hesham Elsharkawy, M.D., on June 28, 2023. (Tr. 848.) Mr. Medina reported ongoing pain in his right knee, as well as continued radiating pain in his spine (*Id.*). Mr. Medina received an injection in his knee. (Tr. 852.)

On July 20, 2023, Mr. Medina underwent a consultative mental examination with Charles Misja, Ph.D. (Tr. 628–32). Mr. Medina reported that he is in chronic pain; he ambulated with a cane to the appointment. (Tr. 629.) Mr. Medina said that he was thinking about "going to school to become a counselor and working at a treatment center." (*Id.*) Mr. Medina reported that he requires assistance in showering and regularly uses a wheelchair and crutches. (Tr. 630.)

Ultimately, Dr. Misja found support for diagnoses of mild opioid use disorder (in sustained remission) and unspecified depressive disorder with anxious distress. (Tr. 631.) Dr. Misja opined that these conditions would only cause "minimal" limitations in Mr. Medina's mental functional capacity (Tr. 632).

On July 26, 2023, Dr. Finke wrote a letter regarding his treatment of Mr. Medina. (Tr. 626) Dr. Finke wrote that Mr. Medina had a "complicated medical history that at this time makes it difficult for him to participate in work." (*Id.*) Dr. Finke recounted that Mr. Medina has a history of vertebral osteomyelitis that required "intense surgical management" years ago in Florida. (*Id.*) Dr. Finke's wrote that "[o]ver the past few years he has had increasing pain and reduce[d] mobility in the cervical region." (*Id.*) Dr. Finke identified the source of that pain as loose hardware from the previous surgery. (*Id.*) The doctor noted that Mr. Medina was consulting with neurosurgeons and advised that "extensive surgery" may be required to fix the issue. (*Id.*)

Mr. Medina received a spinal injection on July 27, 2023. (Tr. 657–58.)

12

On August 23, 2023, Mr. Medina received a spinal injection and underwent a procedure in which a nerve stimulator was implanted into his back. (Tr. 649, 821.) X-ray imaging revealed junctional spondylosis at the C3–C4 levels, as well as "mild cord deformity." (Tr. 654.)

At an appointment with Dr. Finke on September 12, 2023, Mr. Medina reported that a nerve stimulator in August 2023 had "greatly improved his pain." (Tr. 644.) The plan was for Mr. Medina to try to return to work. (*Id.*) Dr. Finke noted that Mr. Medina had scheduled additional injections in his back and knee. (*Id.*)

At an appointment with Dr. Elsharkawy on September 26, 2023, Mr. Medina said that he was "annoyed" by the nerve stimulator, but he repeated that he was "much better" with the device, with less numbness and paresthesia. (Tr. 808.)

Mr. Medina presented to a hospital emergency room on October 10, 2023, for abdominal pain, nausea, and vomiting. (Tr. 796.) On examination, Mr. Medina displayed mild tenderness to abdominal palpation and had a positive Murphy's sign. (Tr. 797.) Ultrasound imaging revealed "gallbladder sludge," but there was no evidence of acute cholecystitis. (Tr. 798.) Mr. Medina improved with treatment in the hospital and was discharged with a recommendation that he discontinue marijuana use. (Tr. 799.)

On October 28, 2023, Mr. Medina presented to the hospital emergency room saying that he wanted to safely "detox" from a recent relapse of Percocet and heroin use. (Tr. 904). The triage doctor noted that this was Mr. Medina's fourth hospital visit in 24 hours. (*Id.*) On examination, Mr. Medina was positive for neck pain but negative for neck stiffness. (Tr. 905.) There was no tenderness to palpation of the cervical spine, and there was no step off or deformity noted. (Tr. 906.) He had normal range of motion, including in the cervical spine. (Tr. 907.) Mr. Medina was found to be stable and was discharged to a diversion center. (*Id.*)

Mr. Medina underwent a mental-health evaluation at the diversion center on November 1, 2023. (Tr. 890.) During his intake, Mr. Medina reported active mental health symptoms that included depression, anxiety, difficulty trusting others, hypervigilance, hopelessness, insomnia, and difficulty concentrating (Tr. 890–91).

Mr. Medina consulted with Dr. Elsharkawy on December 7, 2023. (Tr. 974.) He again reported that he was "much better" with the nerve stimulator, although before he went to the hospital he had been scheduled to have it removed because he was still "annoyed" with the device's connections. (*Id.*) Dr. Elsharkawy removed the device's leads at the appointment. (*Id.*) Mr. Medina said he was interested in exploring "internal permanent options." (*Id.*) On examination, Mr. Medina displayed full strength and a normal gait but was positive for severe tenderness of the left side of the thoracic spine and displayed limited range of motion in several areas. (Tr. 977). An x-ray revealed findings consistent with posterior hardware loosening, although unchanged from previous images. (Tr. 969). Imaging on Mr. Medina's knee was positive for only a "[s]mall suprapatellar joint effusion." (Tr. 974.)

Mr. Medina consulted with Dr. Finke on December 18, 2023 (Tr. 966). On examination, Mr. Medina displayed normal gait and coordination. (Tr. 967.) Mr. Medina reported that he was hoping to reduce his suboxone dosage with continued injections and interventions on his spine. (Tr. 966.)

Mr. Medina consulted as a new patient with Madeline Gerwig, M.D., on January 25, 2024, for neck and bilateral shoulder pain. (Tr. 1030.) Mr. Medina reported that his current treating surgeon (Dr. Belding) was "hesitant to operate again until other options including injections and implants have all been tried." (*Id.*) Dr. Gerwig noted that Mr. Medina had been treated with a temporary subcutaneous stimulator and had a peripheral stimulator for the dorsal rami, which "did

offer some relief but[] had issues with leads staying in place, so it was ultimately removed." (*Id.*) Mr. Medina had discussed the option of a permanent device, but Mr. Medina had not pursued it. (Tr. 1030–31.)

Mr. Medina described a "burning/prickling" pain that began soon after his 2018 spinal surgery but which has been getting worse and radiating into his shoulders over the past year. (Tr. 1031.) The pain was associated with numbness, tingling, and weakness that interfered with his work as a barber. (*Id.*) On examination, Mr. Medina's neck appeared normal and had no swelling. (Tr. 1032.) His gait was normal, and he displayed full lower extremity strength and near full (4 out of 5) upper extremity strength. (*Id.*)

Dr. Gerwig counseled Mr. Medina "at length" about potential interventions—including a intrathecal pump and a spinal cord stimulator—but ultimately advised that those interventions "would only be masking pain and would not keep [him] from requiring further corrective surgery." (Tr. 1032.) Dr. Gerwig opined that she was "doubtful that any injection would be beneficial" because Mr. Medina's "hardware continues to shift." (*Id.*) She also candidly advised that "a completely pain free life may not be achievable" even with interventions. (*Id.*) She sent Mr. Medina to consult with Dr. Belding about the options and return with a decision about how to proceed. (*Id.*)

Mr. Medina consulted with Dr. Finke on March 21, 2024. (Tr. 157.) Dr. Finke assessed that Mr. Medina had "increased muscle tone, reduced strength and increased reflex on exam," which was "[c]oncerning for worsening of known cervical radiculopathy." (*Id.*) Dr. Finke noted that Mr. Medina had an upcoming appointment with a spinal surgeon. (*Id.*) He described the conversation as "[d]ifficult" but noted that Mr. Medina had "failed other conservative treatments." (*Id.*)

On March 22, 2024, Dr. Finke completed another letter on Mr. Medina's behalf (Tr. 1078). Dr. Finke wrote that Mr. Medina had "done everything asked of him to evaluate the hardware in his cervical spine which is malfunctioning causing severe pain, reduce[d] mobility and significant debility." (*Id.*) Dr. Finke opined that Mr. Medina was "very likely to need revision of hardware requiring multiple cervical spine surgeries." (*Id.*)

Mr. Medina consulted with Dr. Belding on March 27, 2024. (Tr. 154.) Dr. Belding summarized that Mr. Medina was status post anterior fusion in 2018, which had healed well. (*Id.*) The procedure involved connecting the rods to a thoracic screw, which had since become loose, causing pain. (*Id.*) Dr. Belding discussed surgical options with Mr. Medina, "[g]iven that he has failed injections," which would likely entail a front-back neck surgery in which Dr. Belding would remove the screws from the upper thoracic spine and "extend him out from the C3 to T1 or C7 level." (Tr. 156.)

By April 4, 2024, Mr. Medina's treating physicians and he had decided to proceed with spinal surgery. (*See* Tr. 148.) Dr. Finke wrote on that date that he agreed with that course of treatment in light of Mr. Medina's increasing weakness, numbness down the left arm, and "further deterioration in his ADLs." (*Id.*)

On May 3, 2024, the ALJ issued his written decision finding that Mr. Medina is not disabled. (Tr. 102–28.)

Mr. Medina was admitted to the hospital for surgery on May 20, 2024. (Tr. 28.) A neurosurgeon indicated that surgery was still indicated. (*Id.*)

Mr. Medina thereafter underwent elective spinal surgery, which involved anterior cervical discectomy and fusion at the C3–C5 levels, removal of posterior hardware, and posterior fusion at the C3 to T1 levels. (Tr. 29.)

Mr. Medina was discharged in stable condition on May 23, 2023, with instructions to follow up with Dr. Belding. (*Id.*)

The medical records also reflect that Mr. Medina is diagnosed with hepatitis B, which has been treated with medications throughout the entirety of alleged period of disability. (*See, e.g.*, Tr. 543, 993).

## IV. THE ALJ'S DECISION

The ALJ determined that Mr. Medina had not engaged in substantial gainful activity since December 9, 2022, the application date. (Tr. 107.) The ALJ noted that Mr. Medina had two unsuccessful work attempts in 2023 and had testified that he left both positions because pain prevented him from working. (Tr. 108.)

The ALJ next determined that Mr. Medina had the following severe impairments: (1) degenerative disc disease of the cervical spine; (2) hepatitis B; (3) major depressive disorder; (4) anxiety disorder; (5) post-traumatic stress disorder (PTSD); and (6) polysubstance abuse disorder. (Tr. 108.)

The ALJ then concluded that none of Mr. Medina's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

The ALJ determined that Mr. Medina had the residual functional capacity ("RFC") to perform work at the sedentary exertional level (as defined at 20 C.F.R. 404.1567(a) and 416.967(a)) but with several exertional and non-exertional limitations. (Tr. 115.)

With respect to exertional limitations, the ALJ found that Mr. Medina could occasionally reach overhead with the right and the left upper extremities and frequently reach in all other directions; he could frequently handle and finger bilaterally; he could occasionally climb ramps and stairs but could never climb ladders, ropes, or scaffolds; and he could occasionally balance,

stoop, kneel, crouch, and crawl. (*Id.*) The ALJ further found that Mr. Medina could never operate a motor vehicle or be exposed to unprotected heights or moving mechanical parts. (*Id.*)

With respect to non-exertional limitations, the ALJ concluded that Mr. Medina retained the ability to understand, remember, and carry out simple instructions. (*Id.*) The ALJ further found that Mr. Medina remains able to use his judgment to make simple work-related decisions. (*Id.*) But the ALJ concluded that Mr. Medina could not perform work requiring a specific production rate (i.e. assembly line work) and can handle only occasional changes in a routine work setting. (*Id.*) Finally, the ALJ found that Mr. Medina is able to frequently interact with supervisors, coworkers, and the public. (*Id.*)

The ALJ found that Mr. Medina was 42 years old on the application date and had at least a high school education. (Tr. 127.) The ALJ concluded that Mr. Medina was unable to perform his past relevant work as a barber. (Tr. 126.) But the ALJ determined that—considering Mr. Medina's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that he could perform, including work as a "circuit board assembler" (DOT 726.684-110), "final assembler" (DOT 713.687-018), or "inspector" (DOT 669.687-014).[3]

Accordingly, the ALJ determined that Mr. Medina is not disabled. (Tr. 128.)

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v.*

---

[3] These jobs refer to entries in the U.S. Department of Labor's *Dictionary of Occupational Titles*. The DOL no longer publishes the tool—*see Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)—but the most recent version, from 1991, is available online through the DOL's Office of Administrative Law Judges Law Library. *Dictionary of Occupational Titles—Fourth Edition, Revised 1991*, U.S. DEPT. OF LABOR OFF. OF ADMIN. L. JUDGES, https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT.

*Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.    Standard for Disability

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio

Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C. <u>Analysis</u>

#### 1. *First Assignment of Error – Mr. Medina's Potential Future Surgeries*

In his first assignment of error, Mr. Medina argues that the ALJ failed to adequately consider how the additional spinal surgeries he may need would affect his capacity to sustain substantial gainful activity. Mr. Medina points to medical evidence showing that he had undergone previous spinal interventions, which had not been successful at alleviating his pain, as well as evidence showing that the hardware placed in his spine was failing and would need to be addressed through multiple additional surgeries to fix the hardware or otherwise remediate the condition. Mr. Medina states, in conclusory fashion, that "[c]learly," such a course of treatment would require a "prolonged" recovery period affecting his ability to work to the extent to render him disabled. Mr. Medina says that the ALJ failed to consider that possibility and, at the very least, should have ordered an additional consulting medical opinion to determine how the surgeries would affect Mr. Medina's ability to function in the year following the future surgery.

The Commissioner defends the ALJ's decision, arguing that the ALJ explicitly stated that the RFC was assessed between the date of the alleged onset of disability and the decision date; the Commissioner argues that the ALJ was not required to consider evidence after that date, such as the impact "from a surgery Plaintiff had not yet undergone."

Mr. Medina does not direct the Court to any caselaw specifically discussing an ALJ's duty (if any) to try to anticipate the future disabling effects of a potential planned surgery in adjudicating a claimant's application for SSI or DIB. Moreover, while he argues that the ALJ should have obtained another consulting medical opinion, he does not discuss the regulations relevant to that decision or meaningfully address the factors ALJs are to consider in deciding whether such an opinion is necessary. A perfunctory or undeveloped argument regarding an ALJ's alleged error is deemed waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). It is not up to the Court to "put flesh" on an otherwise "skeletal" argument. *Id.* That said, even after considering ways to put flesh on Mr. Medina's argument, it remains unconvincing.

Certainly, ALJs can and do consider the opined need for future surgery in assessing the severity of a claimant's current limitations. *See, e.g.*, *Cashin v. Comm'r of Soc. Sec.*, No. 3:20-cv-186-DJH-CHL, 2022 WL 4595067, *4 (W.D. Ky. Sept. 30, 2022) (considering claimant's testimony that he would need a knee replacement); *Drain ex rel. D.S. v. Comm'r of Soc. Sec.*, No. 1:12–cv–759, 2014 WL 144524, *8 (S.D. Ohio Jan. 14, 2014) (stating, in the context of a childhood disability claim, that "the potential need for future surgical treatment does not constitute a marked limitation on plaintiff's health and physical well-being"). Here, though, Mr. Medina does not seem to argue that his prospective surgery reflected on his current limitations in a way that the ALJ failed

to consider. He seems to be arguing that the evidence supports that he *will become disabled* in the future by virtue of the contemplated surgeries. As the Commissioner points out, this is procedurally anomalous. It is unclear how the ALJ could be required to anticipate the future deleterious effects of a contemplated surgery, just as it would be unclear how the ALJ could anticipate the future beneficial effects of the contemplated surgery (i.e., how a future surgery may reduce a claimant's functional limitations).

Further, to the extent that Mr. Medina argues that the matter should be remanded based on post-decision evidence regarding the surgery, it is true that the post-decision evidence shows that he underwent a significant spinal surgery weeks after the Commissioner's decision. But evidence of a condition worsening after the Commissioner's final decision is not necessarily material to that decision. *See King v. Sec'y of Health & Human Servs*., 896 F.2d 204, 206 (6th Cir. 1990) (evidence of worsening condition does not constitute material evidence to a decision made two years prior); *see also Oliver v. Sec'y of Health & Human Servs.,* 804 F.2d 964, 966 (6th Cir. 1986) ("Claimant argues that the evidence shows his condition has worsened since the Secretary's decision was made. While this may be true, it does not affect the Secretary's [earlier] decision.").

Here, the records from MetroHealth dated from January 4 to May 2, 2024 were submitted after the ALJ's decision was rendered. (*See* Tr. 10.) The Appeals Council reviewed the records and either found them immaterial to the Commissioner's decision (with respect to records dated to before the ALJ's decision) or irrelevant to the ALJ's determination of disability (with respect to the records that post-date the decision). (*Id.*) The Court finds no error in that ruling, and further notes (as the Appeals Council did) that Mr. Medina may apply for disability again based on the post-decision surgery if he feels that the actual effects of that surgery render him disabled. (*See id.*)

23

Finally, Mr. Medina argues that the ALJ should have ordered a new consulting opinion, but "[a]n ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917). The Court therefore reviews the ALJ's decision not to obtain an additional medical expert for abuse of discretion. *Pasiak v. Comm'r of Soc. Sec.*, 800 F. App'x 301, 304 (6th Cir. 2019) (citing *Halter*, 279 F.3d at 356). While Mr. Medina does not address that standard or make a meaningful argument that that ALJ abused his discretion in this regard, the Court has carefully reviewed the record and finds no abuse of discretion here.

In conclusion, Mr. Medina's undeveloped argument regarding the prospective (at the time of the ALJ's decision) surgery he was contemplating does not convince the Court that the ALJ made a reversible error in rendering his decision in the matter.

Accordingly, Mr. Medina's first assignment of error is overruled.

### 1.  Second Assignment of Error – Dr. Finke's Opinion Letters

In his second assignment of error, Mr. Medina argues that the ALJ erred by discounting the opinion letters written by Dr. Finke on July 26, 2023, and March 2, 2024. He contends that the opinions are internally consistent and supported by medical records and treatment, calling for greater evidentiary weight "or at least greater explanation."

Social Security Ruling ("SSR") 98-6p provides that "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996). A reviewing court must read the ALJ's decision as a whole. *See Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021).

Agency regulations state that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

Instead, the SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. See 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2).

"As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022). That is the case here.

25

In finding Dr. Finke's opinions only partially persuasive, the ALJ stated as follows:

> To the extent that Dr. Finke's opinions are on issues reserved to the Commissioner – i.e., opinions regarding whether or not the claimant is disabled, able to work, or whether he is prevented from performing past relevant work – they are inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520b(c) and 416.920b(c). However, to the extent that they opine as to the claimant's physical functional limitations (i.e., reduced strength and range of motion in his cervical spine, and reduced coordination), the undersigned finds the opinions partially persuasive. They are not entirely supported by Dr. Finke's examinations of the claimant (e.g., normal gait and coordination at 7F/39 (08/15/23); 10F/42-43 (12/01/23), 10F/13-14 (12/15/23)), but they generally consistent with the other evidence of record (e.g., imaging of the claimant's spine at 6F/75-76 and 10F/15; remarkable findings as to neck, shoulder, and thoracic spines at 10F/23 (12/07/23)). Because Dr. Finke's opinions are not entirely supported by his own examinations, but the more complete record supports that the claimant has limitations related to his spinal impairments that are consistent with the residual functional capacity finding, the undersigned finds this opinion partially persuasive.

(Tr. 126.)

Mr. Medina makes no argument that the ALJ failed to set forth his consideration of the supportability and consistency of the opinion. Instead, he characterizes the letters as stating the opinion that Mr. Medina is totally disabled and argues that such an opinion is supported and consistent with the other evidence in the record. He further argues that, because the ALJ did not find any medical opinion to be fully persuasive, the ALJ impermissibly "played doctor" in crafting the RFC.

As an initial matter, the Court disagrees with the characterization of the letters as stating the opinion that Mr. Medina is totally disabled. Dr. Finke wrote that Mr. Medina's medical history and condition "make[] it difficult for him to participate in work." (Tr. 626.) He later specifically identified that Mr. Medina had experienced increasing difficulty working *as a barber* (Tr. 1078). But Dr. Finke offered no opinion about any specific functional limitations, beyond identifying that Mr. Medina had experienced "increasing pain and reduce[d] mobility," significant weakness,

26

and reduced coordination. (*See* Tr. 626, 1078.) Particularly relevant to the RFC in this matter, Dr. Finke also offered no opinion about Mr. Medina's ability to adjust to sedentary work. His letters contain no functional limitation inconsistent with the exertional limitations set forth in the RFC.

Having addressed this threshold consideration, the Court turns to a consideration of the ALJ's evaluation of the supportability and consistency of the letters.

An ALJ properly addresses supportability by noting that a physician's opinion is inconsistent with the physician's own treatment records. *See Rattliff v. Comm'r of Soc. Sec.*, No. 1:20-cv-01732, 2021 WL 7251036, at *9 (N.D. Ohio Oct. 29, 2021) (holding that ALJ addressed supportability factor by noting that physician's opinion was inconsistent with physician's treating notes), *report and recommendation adopted*, 2022 WL 627055 (N.D. Ohio Mar. 3, 2022); *Neff v. Comm'r of Soc. Sec.*, No. 5:18 CV 2492, 2020 WL 999781, at *11 (N.D. Ohio Mar. 2, 2020). Here, ALJ stated that Dr. Finke's opinions were partially inconsistent with his own treatment notes. (Tr. 126.) The ALJ accurately pointed out that Dr. Finke's statements were partially inconsistent with examination findings in 2023 that Mr. Medina had normal gait and coordination. (*Id.*)

With respect to consistency, the ALJ actually found that Dr. Finke's statements about Mr. Medina's reduced strength and range of motion in his cervical spine, and reduced coordination— while partially inconsistent with his own evaluations—were generally consistent with the other evidence in the medical record. (*Id.*)

Ultimately, though, the ALJ found any actual functional limitations identified by Dr. Finke—the reduced strength and range of motion in his cervical spine, and reduced coordination, for example—to be consistent with his RFC. (*Id.*) Earlier sections of the decision help explain that conclusion.

Specifically, the ALJ thoroughly summarized and acknowledged Mr. Medina's testimony and allegations about the disabling effect of the chronic pain he experiences. (Tr. 116–21.) But the ALJ found those allegations to be only partially consistent with the record, even in light of the acknowledged medical evidence supporting a conclusion that the hardware in Mr. Medina's spine was loosening. In reaching that conclusion, the ALJ pointed to consistent examination findings that Mr. Medina retained full strength in his extremities and maintained a normal gait despite his alleged pain. (*See* Tr. 118–19.) The ALJ accurately noted that Mr. Medina at various times reported "working out and lifting weights every night" and said he had been playing basketball. (*Id.*; *see also* Tr. 121.) The ALJ further noted, accurately, that Mr. Medina reported significant improvement in pain management with the implanted devices. (Tr. 119.)

After thoroughly and accurately summarizing the medical evidence, the ALJ acknowledged that Mr. Medina's "reports of pain are well documented in the record" but "his examinations generally show full strength, sensation, and range of motion in his lower extremities." (Tr. 121.) The ALJ again noted that Mr. Medina reported "working out and lifting weights every night" and he had been able to play basketball. (Tr. 121–22.) The ALJ further explained that Mr. Medina said she could do laundry and household cleaning and pointed out that "the bulk of his examinations show that he had full strength in his upper extremities" (Tr. 122.)

Considering the ALJ's decision as a whole, the Court finds that the ALJ accurately addressed both the supportability and consistency of Dr. Finke's opinions, and that his conclusions in that regard are supported by sufficient evidence.

Notably, the ALJ's RFC finding does not outright contradict Dr. Finke's opinions. *See Calzo v. Saul*, No. 4:19CV00598, 2020 WL 2362057, at *6 (N.D. Ohio Feb. 4, 2020), *report and recommendation adopted*, 2020 WL 1041213 (holding that ALJ did not err in failing to include

28

limitations identified by state agency psychologists because "[t]he ALJ's RFC finding does not outright *contradict* the State agency opinions, but rather, it simply *omits* the specific limitation about which they opined").

The Court is also not convinced by the argument that the ALJ impermissibly "played doctor" here.

"[A]n ALJ's RFC determination may be supported by substantial evidence, even if no 'physician offers an opinion consistent with that of the ALJ.'" *Fergus v. Comm'r of Soc. Sec.*, No. 5:20-CV-02612-CEH, 2022 WL 743487, at *9 (N.D. Ohio Mar. 11, 2022) (*quoting Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018). Indeed, "[t]he Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence." *Borawski v. Comm'r of Soc. Sec.*, No. 1:20-CV-01091-JDG, 2021 WL 811717, at *18 (N.D. Ohio Mar. 3, 2021).

That is exactly what the ALJ did here, and his RFC is supported by sufficient evidence.

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (*quoting Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Mr. Medina does not point to any inaccuracies in the ALJ's recitation of the medical evidence. Instead, he points to records documenting his history of complaints of intense and chronic pain and his statement to medical professionals that he can only stand for five minutes, sit for less than five minutes, and walk up to twenty minutes. (*See* Tr. 515.)

After careful consideration, though, the Court is convinced that this is a case falling within that "zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Again, a reviewing court may not "resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (*quoting Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)). And even if "a preponderance of the evidence . . . supports the claimant's position," the Court must affirm if "substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

The ALJ carefully considered the record here, including the records that Mr. Medina points to as supporting his desired exertional limitations. Indeed, the ALJ found that Mr. Medina's "reports of pain are well documented in the record." After making this reasonable acknowledgement, the ALJ carefully and thoroughly explained why those subjective allegations are only partially consistent with the record and why the record as a whole supports the limitations in the RFC.

Further, Mr. Medina does not identify any opinion from a medical source assessing a functional limitation more limited than those of the RFC. *See Audino v. Comm'r of Soc. Sec.*, No. 4:17CV1594, 2018 WL 3520836, at *8 (N.D. Ohio July 5, 2018), *report and recommendation adopted sub nom. Audino v. Berryhill*, 2018 WL 3496084 (N.D. Ohio July 20, 2018) (rejecting

claimant's argument that the ALJ should have obtained medical expert testimony, in part, because the claimant "d[id] not cite to any pertinent limitations opined by any medical source and not addressed by the ALJ").

In sum, the Court finds no reversible error in the ALJ's assessment of Dr. Finke's opinions or in his crafting of the RFC in this matter.

Accordingly, Mr. Medina's second assignment of error is overruled.

## VI.    CONCLUSION

Having overruled Mr. Medina's two assignments of error, the Court AFFIRMS the Commissioner's final decision.

Dated:  November 17, 2025                    /s *Jennifer Dowdell Armstrong*
                                            Jennifer Dowdell Armstrong
                                            U.S. Magistrate Judge